RICHARD S. ARNOLD, Chief Judge,
dissenting.
When Mr. Plowman gave Mr. Haley’s memorandum to the FDIC, he was not, in my view, “acting pursuant to the request of’ Mr. Haley, as that phrase is used in 12 U.S.C. § 1831j(a)(2). I therefore respectfully dissent.
The Court holds that this “request” element of the statute has been met. It recites the District Court’s finding “that Plowman and Haley had discussed Plowman’s intention to contact Congress or the FDIC about the problem.” Ante, at 1249 (footnote omitted). Thereafter Haley furnished the memorandum to Plowman with the request that the latter use it in any way that might be appropriate to preserve the independent existence of Marion County Mutual Loan and Building Association. From these facts, the Court infers that Haley at least implicitly requested Plowman to give the memorandum to the FDIC.
It is certainly true that Haley prepared the memorandum and gave it to Plowman. It is likewise true that Plowman turned the memorandum over to the FDIC. The further statement that Plowman and Haley had dis *1252 cussed Plowman’s intention to contact Congress or the FDIC about the problem, however, is simply not supported in the record. With deference, I believe that the finding of the District Court to this effect was clearly erroneous. A careful reading of the testimony of Plowman and Haley points unmistakably to this conclusion.

Bayard Plowman’s Testimony

At trial, Mr. Plowman stated that Mr. Haley told him he was going to write a memorandum to his superiors. Mr. Plowman was asked if Mr. Haley mentioned any other individuals to whom he planned to send the memo, and at first Mr. Plowman replied, “I’m not sure.” Mr. Plowman then mentioned that he was interested in discussing the situation with Congressman Henry Gonzalez, although Mr. Plowman never stated that Mr. Haley told him he planned to send the memorandum to Congressman Gonzalez. Mr. Plowman was asked again to whom Mr. Haley planned to send the memorandum. Mr. Plowman repeated that Mr. Haley was going to send it to his superiors. Then Mr. Plowman testified that he had received a handwritten letter (which he had not saved) with the memorandum from Mr. Haley. Mr. Plowman said, ‘Well, I can’t remember [what the letter from Haley said], but it said, take this letter and do what you can to save yourself.” Mr. Plowman stated that he was going to take the memorandum and see Congressman Gonzalez, but “I made a mistake and gave the letter to the FDIC examiner [Chapman].” Mr. Plowman explained that he had given the memorandum to Mr. Chapman because he viewed him as a kind of “good cop.” Mr. Plowman said that he then made an appointment with Congressman Harold Volkmer, who told Mr. Plowman he would give the memorandum to Congressman Gonzalez.
On cross-examination, Mr. Plowman testified that “[Haley] said to take that note or memo and do whatever is necessary to help yourself out.” He was asked, “so [Haley] did not specify for you to give that directly to the FDIC; isn’t that correct?” Mr. Plowman responded, “I’m not sure of that.” The follow-up question to him was, “In fact, you made the decision to give the memo to the FDIC?” Mr. Plowman answered, “I did make that decision.”
This testimony is from the Joint Appendix — Volume 1 (Appendix) pages 37-47.

Michael Haley’s Testimony

On direct, Mr. Haley was asked about his conversation with Mr. Plowman regarding Mr. Plowman’s concerns about his ability to hold on to Marion County Mutual. Mr. Haley explained that he told Mr. Plowman he wanted to write a letter to Congressman Gonzalez on Mr. Plowman’s behalf, but that Mr. Plowman discouraged Mr. Haley because it would get Mr. Haley into trouble. Mr. Gonzalez is the only name Mr. Haley stated he discussed as a potential memorandum recipient in that conversation with Mr. Plowman. Appendix 191-96.
Mr. Haley testified he wrote the memorandum anyhow. He was asked to whom he planned to send the memo. He explained that after several drafts he still was not sure to whom he would send it, but stated that “one of my drafts, I had addressed it to Senator Bond with a copy — copies to Volk-mer, Danforth, Gonzalez____ And also at that time I'was thinking about giving copies to T. Timothy Ryan, the chairman of the OTS, and L. William Siemann [sic], chairman of the FDIC.” Mr. Haley explained that he was thinking of sending it to Mr. Seidman at the FDIC because of an article he had read in the New York Times which left him with the impression that Mr. Seidman could be helpful, but eventually Mr. Haley rejected the idea. Appendix 198-200.
Mr. Haley testified that, when he called Mr. Plowman to get some numbers, he again mentioned that he was preparing the memorandum. Mr. Plowman advised Mr. Haley not to write it, and Mr. Haley just said “O.K.” to Mr. Plowman, and got the information from Mr. Plowman anyhow. Mr. Haley stated that he changed direction on the substance of the memorandum at that point, and then sent it out, including the copy to Mr. Plowman. Mr. Haley was asked: “And why did you [send it to Plowman]?”
A: Because time is of the essence. I sent copies to the OTS. I was going to give them a chance to do something, but it *1253 looked like time was running out and I had to get it into Plowman’s hands as soon as possible.
Q: Did you send it to him in lieu of sending it to these congressmen and other people that you thought about sending it to?
A: Yes, I did....
Q: And what did you tell [Plowman] in the cover letter?
A: I said, ‘Dear Bayard: This is your copy of a memorandum I am sending to Maffit with copies to [others]. I know you told me not to do this, but I have decided to do it anyway. I strongly urge you to use this memorandum to save the institution or to give this memorandum to anyone who you think can help you save the institution. I think it will help sepárate you from all the other imperiled S & L executives seeking relief.’
Appendix 204-07.
Under cross-examination, Mr. Haley admitted that he had testified differently about his instructions to Mr. Plowman before the Merit System Protection Board. At that earlier proceeding, he had stated that he urged Mr. Plowman to give the memorandum to Congressman Gonzalez, and that that was his only purpose for providing Mr. Plowman with a copy. Counsel asked: “And isn’t it the first time that you felt you were being, terminated for giving a copy of the memo to the FDIC was after section 1831 was amended to include the FDIC in 1991?” Mr. Haley answered, “yes.” Appendix 260-63.
On redirect, Mr. Haley’s lawyer tried to undo the damage from his admission that his Merit System Protection Board testimony was different from what he told the District Court. His lawyer asked, “and then did you think further about how you came to decide who you were going to send it to?” Mr. Haley replied,
A: I just remember, I think what happened was the distribution list kept growing and I just thought, this thing is getting out of control, and I know if I do this, I’m gonna get fired, so at some point, I decided this doesn’t make sense to just, you know, to spray this thing around like that. I’m going. I don’t know who Plowman is trying to see. Why should I be down here in St. Louis trying to guess who he wants to see. I’m just going to turn it over to Plowman and let him identify the people he wants to see.
Q: And he did that, is that right?
A: That’s correct.
Q: And you’ve never claimed in this proceeding that you told him to give it to the FDIC or anybody else in particular?
A: No, I just gave it to him.
Appendix 270-71.
Thus, Haley never told Plowman to send the memorandum to the FDIC. He never even discussed with Plowman the possibility of sending it to the FDIC. Haley thought about the Chairman of the FDIC as a potential recipient, but never mentioned this thought to Mr. Plowman, and later changed his mind about it. I am at a loss to understand what basis there is for any finding that Plowman and Haley had discussed any contact with the FDIC.
At the oral argument in this case, Mr. Haley’s lawyer was asked to identify the strongest evidence in his favor on this issue. He cited page 207 of the Appendix, where Mr. Haley recounts what he said to Mr. Plowman:
I strongly urge you to use this memorandum to save the institution or to give this memorandum to anyone who you think can help you save the institution.
This is a “request,” to be sure, but it is quite general. It does not mention the FDIC or any other specific recipient. So far as this language is concerned, Mr. Plowman could have given the memorandum to the press and still have been within the directions that Mr. Haley gave him.
The statute, to repeat, protects Mr. Haley only if Mr. Plowman was “acting pursuant to the request of’ Mr. Haley when he gave the information to the FDIC. I concede that the words could be stretched to cover this case. Mr. Haley told Mr. Plowman to give the memorandum, essentially, to anyone he thought could help; Mr. Plowman thought the FDIC could help; and he gave the memorandum to the FDIC. I believe a natural reading of the statute requires a more specific connection between the action of the recip *1254 ient of the memorandum and the language used by the person who wrote it. Otherwise, almost any handing over of information by an intermediary could arguably be brought within the ambit of the statute, so long as the ultimate recipient of the information was one of the named federal banking agencies.
Accordingly, I would reverse the judgment of the District Court. I fear that the action our Court takes today will unduly interfere with the authority of agencies of the federal government to run their own business.